Good morning and may it please the court, my name is Stephanie Adractis and I represent the petitioner Keeven Robinson. I would like to reserve two minutes. Mr. Robinson was convicted of two robberies and sentenced to 20 years in prison in a trial that was fundamentally unfair due to prosecutorial misconduct and the ineffectiveness of his trial counsel. The only contested issue at his trial was the identity of the person who had robbed the two victims. Robinson testified that he was not the robber. The prosecutor had originally filed five charges of robbery against Robinson, alleging that he was the lone robber who had committed those robberies as well as an assault. The first jury to hear the case acquitted Robinson of the three robberies and an assault and hung on the remaining two counts, Wooden and Torres. That kind of result is a rare event, particularly when three of the robbery victims identified Robinson. The prosecutor was unable to obtain guilty verdicts in the first trial, probably because of the evidence of Robinson's innocence. Eyewitnesses who said that Robinson was not the robber and the fact that he had no gun or robbery proceeds only a few minutes after the last of the robberies when he was stopped near the Pacific Coast Highway. It is the retrial of those two counts that is at issue here, a trial where the prosecutor committed virtually every kind of misconduct that we see discussed in the case law. The investigating Detective Romero, calling him a fine, fine law enforcement officer and claiming that Detective Romero was truthful and not Robinson. In their difference in their testimony where Robinson had said, I told Detective Romero that I had been at the Jack in the Box restaurant when the wooden robbery occurred and had suggested that footage of him in the store security tapes. The prosecutor, the Court of Appeal called that comment about Detective Romero's credibility an isolated event, but it was not. It was part of a pattern of misconduct that continued and permeated throughout the entire trial. The misconduct was particularly prejudicial when the prosecutor used improper tactics to undermine the other evidence of innocence. And in particular, there were several examples of this kind of misconduct related to the testimony of Ms. Boreas. Ms. Boreas and her husband, Mr. Mejia, were robbed minutes before Mr. Torres. This was one of the robberies of which Mr. Robinson was acquitted in his first trial. Ms. Boreas' testimony at the second trial was obviously exculpatory. She told the jury that Robinson was not the person who robbed her and her husband, Mejia. In the first trial, the prosecutor had clearly argued that the person who robbed all of these victims was the same person. The prosecutor responded to Ms. Boreas' testimony by claiming in his closing argument that Ms. Boreas had been threatened and harassed by a defense investigator who had falsely claimed to her that he was a police officer. The prosecutor also suggested that Ms. Boreas had recanted her exculpatory testimony during a hallway encounter with the prosecutor and her pastor. The prosecutor told the jury that defense counsel had intentionally elicited a racist remark from Ms. Boreas during her testimony and that he did it in order to anger and inflame the jury. The prosecutor also misstated Ms. Boreas' testimony when he claimed that she testified that all black men look alike to her. In fact, she had said that young black men in hoodies looked alike to her. The prosecutor also suggested that Ms. Boreas should not be believed because she had an attorney that was advising her. He simultaneously suggested that she may have... The jury already knew that Ms. Boreas had changed her testimony, though, right? The jury... That's not the case, I believe, Your Honor. I mean, her testimony was somewhat wavering, but she said that she had not said that Mr. Robinson was the man at the time of the field show up. She said that she said that it looked like him or sort of. In other words, she qualified what she had told the officer and what it looked like, a fair reading of the transcript, is she may have said that it looked like him, but the officer wrote down that's him. And she insisted during her testimony, actually, that she had maintained the entire time that she could not identify Robinson as the robber. And at the time of the second trial and at the first trial, both she and her husband quite credibly testified that he was not the man. And they had specific reasons for it. They said his pants were different and they said that he was, Mr. Robinson, a lighter skinned individual than the person who robbed him. So it wasn't as though their testimony was incredible. It was not. And the prosecutor unfairly suggested that she needed a lawyer because, you know, she was lying and also suggested that, well, of course, her lawyer's advising her, so you shouldn't really believe what she has to say. And one of the other inferences improper around that is, of course, Mr. Robinson testified as well. And he, like Ms. Boreas, was represented by counsel. Throughout the cross-examination of Mr. Robinson, you see the prosecutor referring again and again to Mr. Robinson's contacts with his lawyer. You told your lawyer this, your lawyer that. It comes up several times. He's making an improper suggestion there that because Mr. Robinson has a lawyer, he shouldn't be believed, and Ms. Boreas as well. The Court of Appeal opinion unreasonably determined the facts when they found that Ms. Boreas' testimony was somehow collateral or not really that important. They dismissed this whole line of misconduct as not really being that important to the outcome. Even the prosecutor himself at one point in the transcript said, well, yeah, the reason that that result happened in the first trial was because of Mejia, because of the Mejia case. Well, Ms. Boreas' testimony is about the Mejia case. It's her and her husband, Mr. Mejia, who were the ones who was critical to this trial because if believed, then the jury should have acquitted Mr. Robinson of the Woodin and Torres crimes as well as the three that he was acquitted of in the first trial. If one looks at the timeline given by the prosecution witnesses, the evidence of innocence here is quite convincing. Mr. Woodin was robbed at about 630, but then the Torres and Mejia robberies happened quite close together at 820 p.m. and then at 825 p.m. Mr. Robinson wasn't just stopped once by police. He was stopped two times before 831 p.m. The call that went out saying that police, the second set of police were talking to him, went out at 831 p.m. How was it that he could have been stopped twice, not perspiring, not out of breath, no gun, no robbery proceeds, and those police officers did a thorough search of this area? Mr. Atrakis, if I could interrupt for just a minute. The problem in your case, as opposed to maybe some of the previous one, is Mr. Robinson had a very good lawyer who really did a very effective job of both cross-examining the government witnesses and also making objections and the trial judge did a pretty good job of sustaining objections when appropriate, instructing the jury to disregard things. And I agree with you 100 percent, the prosecutor made continuous wrong arguments and misconduct, but how can we say that that reaches the level we have to, to look at this and say this, even under AEDPA, we can step in? I mean, where's a prosecutorial misconduct case that's sort of a cumulative misconduct case rather than a specific violation of rights case? Well, the, you know, unfortunately in the Supreme Court authority that discusses this sort of long-term, you know, through the whole trial kind of misconduct, which I believe is Berger, they state in the opinion that this was throughout the trial, that there was a lot of misconduct going on, but they don't articulate point by point each instance of misconduct. So that's probably the best case as far as, you know, what Your Honor is describing as a kind of permeated the trial type of misconduct, but we don't, you know, we don't have exactly point by point what happened in this case. But that is what was going on in this case. We have a prosecutor here who was on a mission. He'd, you know, been defeated in the first round and he was going to get this defendant the second time and he did it by anticipating what that innocence evidence was going to be and then undermining it in a way that he's constitutionally not allowed to do. And if a fair presentation was made of these facts, particularly with this timeline, with this, you know, with the evidence that we had of witnesses flatly denying that this was the man when they had no reason to say, you know, say that wrongly, especially from the beginning, that there should have been an acquittal in this case as well without this misconduct and it was outcome determinative. Thank you, counsel. We'll still give you two minutes for rebuttal. Good morning, Your Honors. May it please the Court, Seth McCutcheon on behalf of Respondent. Your Honors, while there are a lot of allegations that have been made, I think there's a distinction that must be made between prosecutorial errors and prosecutorial misconduct. I would submit that nothing the prosecutor did rose to the level of misconduct. Admittedly, there were a few errors that were made during this trial. However, for a cumulative analysis... Well, didn't the judge tell him, stay away from this area, can't get into that? I believe Your Honor is speaking... And he did it. Correct, Your Honor. He did it several times. I believe you're speaking to the inconsistent theory of guilt allegation. There was a break during the defendant's testimony where there was a discussion about whether the prosecutor could proceed on an inconsistent theory of guilt. Prosecutor indicated he was not proceeding on an inconsistent theory of guilt, which he did not do. The theory never changed between the first and second trial. It was that petitioner had personally committed these robberies. Whether there was someone with him or not changed though, right? No, I wouldn't say it did, Your Honor. Admittedly, there was new evidence that was admitted through Xiomara Martinez. I think if you look at how it was admitted and what was admitted in context though, I think it's clear that the theory did not change. But in the second trial, people testified that there was a second, not defendant, but a second assailant. And in the first trial, no one said that, did they? Well, I would disagree with the characterization as assailant. Ms. Martinez did testify that there was a second person present. However, that was going to come out regardless. I think what the prosecutor wanted to give... Well, it didn't come out in the first trial. I don't know what you mean by it was going to come out regardless. Because at the first trial, what also didn't come out was the 911 call that Ms. Martinez made. And in this 911 call, there was extremely relevant and probative material such that there was a description given that matched the description that both Wooten and Torres gave. So the prosecutor then reasonably had a discussion with Martinez, assumedly learned that her testimony was going to differ from what she had said in the 911 call. The prosecutor then had two options. Of course, it was a discoverable. He would have turned that over to defense counsel. So he could either let defense counsel bring it up and impeach Ms. Martinez after she had testified regarding the 911 call, or he can get in front of it and bring it out himself, which is exactly what he did. So just because he introduced what Martinez was going to testify to in trial doesn't necessarily mean that he was introducing the second person. He was just trying to get in front of what Martinez was going to testify and the inconsistency of that testimony between the testimony that she gave and her 911 call. As for the vouching, there simply wasn't a case of vouching. And again, I would direct the Court to look at the discussion in context. And if we look at the statement that actually was made, the fine, fine law enforcement officer, it was in direct response to defense counsel's repeated attacks on the investigation itself. Defense counsel made numerous attempts to highlight the fact that Petitioner had allegedly told the prosecution that the prosecution had been involved in a crime. And that's a very, very important point. How could the statement, I submit to you that Detective Morales is credible, not be vouching? Well, I would admit that that's not the most articulate statement. It's vouching. No, it's not vouching, Your Honor. What do you think? Give me your version of vouching. Absolutely. Vouching would be when you place the prestige of the government behind the witness. You personally say, I know this witness. This witness would not lie. Or you suggest that the witness has some information beyond what's in the record for their testimony. I don't agree with the last point, but before that, that's what he said. And I would disagree. I don't think he's commenting on the truthfulness of Officer Romero at that point. Well, it's Morales, I think, but he says, I'll put those two witnesses before anybody, any day, and I submit to you that Detective Morales is credible. I'm sorry. I was speaking as to the fine, fine law enforcement officer. Regarding the credibility discussions between Morales, and then he does say it again with Officer Romero, but I think it's in the context of he's presenting a statement that says, Romero is saying this. The defendant is saying this. One of them is lying. I submit to you that Romero is not. I don't think he's. But when he says he's a fine, fine police officer, he says, I've worked with this person. I know his reputation. This is one of the best police officers. You know, if you say you have an instruction from the court saying who has something to gain here and how do you determine credibility, you talk about his years as a police officer, you're fine on that. But when you say, here's a defendant, he'll lie to you because he wants to get out from under this charge, and a police officer who I'm telling you is a veteran police officer, a fine public servant, that's vouching. Now, it may not be a constitutional violation, but it was certainly something objectionable, but go ahead. Well, I mean, again, I would disagree with the characterization. I think it's, you know, while maybe a better statement would have been petitioner or defendant is lying, you're again, you're presenting, you know, two entirely inconsistent statements. So when Morales said that Boreas had approached him and told him that she had lied at the first trial, and then Boreas came in and said, no, Morales is lying, I never said that, the jury is left with, you know, to decide. And the jury should decide rather than the prosecutor saying this witness is the one who's credible, right? I mean, and I know that because I know him and he's a good detective. And I agree, that is a decision for the jury. I would just disagree that I think the prosecutor, well, again, may have been inarticulate, was just stating I submit to you that this person is the one to believe. I don't think he was saying that, you know, why you should believe him, you know, based on my personal opinion. It's just you have to believe one. I submit that you should believe this one. As for the fine, fine officer comment, I think that was regarding the competence of the investigation and whether he would have gone out and looked at surveillance video. I don't think he was speaking as to the truthfulness of Officer Romero. But he was suggesting by saying that that there must not be video, right, which we don't know whether there was or not. Well, I think it was a reasonable inference that had Petitioner told Officer Romero that he was at a business where there was surveillance video that Officer Romero would have investigated it. Officer Romero did testify that Petitioner never told him that he was at a business. Officer Romero also testified that Petitioner did tell him about the abandoned house that he lived in, which Officer Romero did go investigate. So I think it's a reasonable inference to say Officer Romero was competent, did follow up on the leads that he had. Had he been presented with this other lead that Petitioner is now presenting, he would have followed up on that. Regarding the allegations of the misstatements with Boreas, admittedly there were two misstatements. The district court found as such those statements while obviously misstatements. They weren't gross misstatements. I think when you look at the statement, all black men look alike versus all black men in hoodies look alike, I think the statement is still racist in nature, and I think the prosecutor had every right to bring that up. It was clearly the defense strategy right from the beginning to highlight cross-racial identification issues and to try and inflame the jury. And I think by asking Ms. Boreas questions such as, you think all black men in hoodies look alike, correct? I think that certainly was a comment or a question presented to elicit a statement that would inflame the jury, and I think the prosecutor in its wide latitude during close, it was appropriate for him to comment on that. I am prepared to speak as to all the allegations. I don't know if the court has any specific allegations that they would like me to go into further. Thank you, counsel. Thank you. I would just like to briefly respond to some of the court's questions. The court asked about whether the trial judge had instructed the prosecutor at any point, don't go into this, and there were some statements made, particularly as to bringing up this new theory that perhaps there was a second robber and also the new theory that perhaps Torres and Mejia weren't robbed by the same person. The trial judge said that's unethical. You know, basically stop doing that. Don't do that. You've already said at the other trial, you know, made your pitch that this was the same person, and you can't now change that. In bringing up and bringing in the live testimony of Ms. Martinez, the prosecutor was undermining the innocence evidence with this new idea that somehow there was a second person robbing Mr. Wooden. And if you look at the 911 tape, which is in the clerk's transcript, although not in the excerpt of record, it does tend to show that she called the police and she described one person, which she admitted under cross-examination at the trial. So this is an extremely dubious tactic here of suggesting there was a second person. And I would submit that it was to undermine the factual scenario that we talked about earlier, how in the world could Mr. Robinson have robbed these two men and, you know, within a couple minutes be so relatively far away and with nothing, suggesting that he just committed a robbery, no gun, no money. I mean, if the only way to really reconcile that and undermine it actually is to suggest to the jury that there was a second man. And that was done through the testimony of Ms. Martinez, where she gave testimony that flatly contradicted what she told the 911 operator. And there was no detailed description of Mr. Robinson. Torres said he was robbed by a black man. That was the description before he went to the field show up, being shown one person, Mr. Robinson. That's where his description came from. And Mr. Wooden as well, he was knocked out. He didn't give a detailed description, and he also gave a very generic description of someone who was close in height to himself wearing baggy clothes. There just isn't enough there to say, oh, yes, these identifications are really reliable. They're just not. And, you know, as to whether or not Detective Romero would have followed up on all leads, Mr. Wooden was bludgeoned with a gun. Defense counsel asked, did you ever test Mr. Robinson's clothes to see if he had any blood on him? No, they never did. The two witnesses, Mejia and Torres, both said that their wallets were handled by the robber. They never tested for fingerprints or DNA. So it's just not the case that Mr. Robinson was obviously incredible when he said I told Detective Romero I was at a jack-in-the-box. Thank you, counsel. Thank you. Thanks, both sides, for the helpful arguments. The case is submitted.
judges: Pregerson, Friedland, Lasnik